# In the United States District Court
# for the Southern District of Georgia
# Savannah Division

USI INSURANCE SERVICES LLC,

    Plaintiff,

    v.

ASHLEY L. TILLMAN and H. FRANK
GARRISON,

    Defendants.

4:23-CV-54

## ORDER

Before the Court is Plaintiff USI Insurance Services LLC's
("USI") motion for summary judgment, dkt. no. 78, as well as
Defendants Ashley Tillman and Frank Garrison's motions for summary
judgment, dkt. nos. 74, 75. The motions have been thoroughly
briefed and are ripe for review. Dkt. Nos. 74-1, 75-1, 78-1, 87,
89, 95, 96, 97, 111, 114. For the reasons stated below, Plaintiff's
motion is **GRANTED in part** and **DENIED in part**, and Defendants'
motions are **GRANTED in part** and **DENIED in part**.

## BACKGROUND

### I.  Factual Background

USI is a major insurance brokerage firm that "provides a full
range of insurance, risk management, and other related services to
thousands of clients nationwide." Dkt. No. 32 ¶ 10. The insurance

brokerage field is extremely competitive and dependent upon the relationships between insurance brokerage employees and their clients. Id. ¶ 12. Two insurance brokerage employee positions central to this field are "producers" and "account executives." Id. ¶ 14. A producer is a "sales position responsible for finding new clients and growing new business sales revenue and maintaining and growing existing client revenue." Dkt. No. 89-2 at 3. An account executive is "the primary service contact for complex clients and [is] responsible for client satisfaction, including some strategic planning responsibilities, manag[ing] a complex book of business, and attend[ing] and [leading] meetings with [] clients." Id. at 4.

Defendant Frank Garrison was a producer of employee benefits insurance with USI. Id. at 3. Specifically, "Garrison was responsible for driving new business sales revenue growth, existing client revenue retention, and growth through the execution of USI's processes and supporting best practices based upon [an] assigned book of prospects and clients." Id. Further, his job "included communicating USI's solutions and work product to non-insurance buyers and strategizing to retain a minimum of 92% of business year-over-year." Id.

Defendant Ashley Tillman was an employee benefits account executive with USI. Id. at 4. Tillman was responsible for managing "all of the day-to-day activities with the clients she serviced."

2

Id. During Tillman's time at USI, the company awarded her for providing exemplary services to clients and her clients referred to her as "exceptional." Id. at 6.

Defendants worked in USI's Savannah office and serviced the same clients. Id. at 6–7. Relevant to this case, those clients included Fuji Vegetable Oil, Inc. ("Fuji"), Roger Wood Foods, Grayco, and Houston Healthcare. Id. USI alleges that Defendants' positions allowed them to access and receive "a substantial volume of USI's confidential information and trade secrets" that "is valuable to the business of USI and could be used by competitors for their benefit and to USI's detriment." Dkt. No. 32 ¶¶ 22, 24.

Defendants entered into employment agreements with USI that included multiple restrictive covenants. Id. ¶ 28. These covenants included agreements to not solicit USI's clients and active prospective clients, to not "solicit or induce any employee of USI to leave USI for a competitor," and to not disclose confidential information. Id. at 9–16. Garrison also covenanted "not to compete against USI with respect to certain clients and prospects" and agreed that he owed a duty of good faith and loyalty to USI. Id. Tillman also understood that she owed USI a duty of loyalty. Dkt. No. 87-1 ¶ 54. These covenants applied while Defendants worked at USI and for a specified period after leaving the company. Id. at 9–16.

USI alleges that Defendants first breached these covenants by

inducing one another to resign from USI and join Palmer & Cay ("P&C"), a Savannah-based insurance brokerage firm. Id. at 21-23. According to USI, Defendants communicated with P&C about possible employment and disclosed confidential information about USI's clients. Id. ¶¶ 59-62. P&C offered Defendants jobs and, after discussing and confirming with one another, Defendants resigned from USI and accepted new positions with P&C. Id. ¶¶ 63-68. Shortly after Defendants moved to P&C, Fuji, Roger Wood Foods, and Grayco contacted Tillman and asked how they could transfer their brokerage accounts. Dkt. No. 89-2 at 36-41. Tillman then provided contact information for P&C members who could handle the transition. Id. USI claims that Tillman "had direct and indirect contact with [the former clients] about changing their employee benefits insurance brokers from USI to P&C before each such client executed and sent a [broker of record] notice." Id. at 45. The three former clients subsequently transferred their business to P&C. Dkt. No. 32 ¶¶ 69-72.

Houston Healthcare initially stayed with USI. Dkt. No. 89-2 at 47. It began considering P&C as an option during a request for proposal ("RFP") process to select an employee benefits insurance broker. Id. at 58-62. The parties dispute whether Tillman and Garrison were involved in securing Houston Healthcare as a P&C client. Id. As Houston Healthcare underwent the RFP process, P&C submitted a 122-page proposal and showed a presentation outlining

4

its pitch for why the company should become a P&C client. Dkt. No. 87-1 at 79–83. Tillman assisted in preparing the presentation and the proposal. Id. USI argues that Tillman used confidential information to prepare both. Dkt. No. 32 ¶ 129. While the parties disagree over Tillman's actions, they do agree that near the end of the RFP process Garrison sent a pizza lunch to Houston Healthcare employees. Dkt. No. 89-2 at 67. Around one week after this pizza luncheon, Houston Healthcare announced that it was transferring its business to P&C. Id. at 68.

USI alleges that it has suffered damages and that it "is now in a vulnerable position with the potential for continued loss of business and harm to its goodwill due to Defendants' improper actions." Dkt. No. 32 ¶¶ 91–92. It brought this action seeking compensatory damages, punitive damages, attorneys' fees, and an injunction. Id. at 44.

## II.  Plaintiff's Claims

Plaintiff's remaining substantive claims against Defendants are:

- Breach of non-solicitation covenants against Tillman and Garrison;

- Breach of non-compete covenant against Garrison;

- Breach of employee non-interference covenants against Tillman and Garrison;

- Breach of confidentiality and non-disclosure covenants

5

against Tillman and Garrison;

- Breach of the duty of loyalty against Tillman and Garrison;

- Breach of fiduciary duty against Tillman and Garrison.

Dkt. No. 32.

## LEGAL AUTHORITY

### I.  Summary Judgment

The Court should grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party. Id. at 252. Additionally, the

party opposing summary judgment "may not rest upon the mere allegations or denials in [her] pleadings. Rather, [her] responses . . . must set forth specific facts showing that there is a genuine issue for trial." Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

The Court views the record evidence "in the light most favorable to the [nonmovant]," Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and will draw all justifiable inferences in the nonmovant's favor, Anderson, 477 U.S. at 255.

## II.   Cross Motions for Summary Judgment

The filing of cross motions for summary judgment does not change the Rule 56 standard. See 3D Medical Imaging, Sys., LLC v. Visage Imaging, Inc., 228 F. Supp. 3d 1331, 1336 (N.D. Ga. 2017); Westport Ins. Corp. v. VN Hotel Grp., LLC, 761 F. Supp. 2d 1337, 1341 (M.D. Fla. 2010) (citing Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007)). The same standard applies to cross motions for summary judgment just as if only one party had moved for summary judgment and "simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." Yager v. Lockheed Martin Corp., No. 1:14-CV-1548, 2016 WL 319858, at *3 (N.D. Ga. Jan. 26, 2016). "Cross-motions must be considered separately, as each movant bears

the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." <u>Shaw Constructors v. ICF Kaiser Eng'rs, Inc.</u>, 395 F.3d 533, 538-39 (5th Cir. 2004).

## DISCUSSION

As an initial matter, the restrictive covenants in dispute are governed by the Georgia Restrictive Covenants Act (O.C.G.A. § 13-8-50 *et seq.*) ("RCA"). "The purpose of the RCA is to provide predictability to parties by setting out rules for restrictive covenants, including non-competition and non-solicitation provisions." <u>Steuer v. Tomaras</u>, No. 20-GSBC-12, 2022 WL 2189216, at *5 (Ga. Bus. Ct. Jan. 28, 2022) (citing O.C.G.A. § 13-8-50). The RCA requires that "[t]he person seeking enforcement of a restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant." O.C.G.A. § 13-8-55. If the party seeking to enforce the covenant "establishes by prima-facie evidence that the restraint is in compliance with the provisions of Code Section 13-8-53, then any person opposing enforcement has the burden of establishing that the contractually specified restraint does not comply with such requirements or that such covenant is unreasonable." <u>Id.</u> Pursuant to O.C.G.A. § 13-8-53, "[c]ontracts that restrict competition during the term of a restrictive covenant" must be "reasonable in time, geographic area, and scope of prohibited

activities."

"Whether the restraint imposed by the employment contract is reasonable is a question of law for determination by the court." W.R. Grace & Co., Dearborn Div. v. Mouyal, 422 S.E.2d 529, 531 (Ga. 1992) (citation omitted). A restrictive covenant that fails to comply with the requirements of O.C.G.A. § 13-8-53 is "unlawful and is void and unenforceable." O.C.G.A. § 13-8-53(d). A court, however, may modify an offending restrictive covenant to make it enforceable—a process known as blue penciling—"so long as the modification does not render the covenant more restrictive with regard to the employee than as originally drafted by the parties." Id.; see also Steuer, 2022 WL 2189216, at *5.

## I. Breach of Non-Solicitation Covenant

USI first alleges that "Garrison's action of disclosing the identities of USI Client Accounts to P&C in order for [P&C] to target such accounts and Tillman's affirmative action of coordinating the discussion between [P&C] and Grayco, Fuji Oil, Roger Wood Foods, and other USI Client Accounts so that P&C could encourage and facilitate the transfer or attempted transfer of these Client Accounts' business constitutes prohibited conduct under the language of the Non-Solicit Covenants." Dkt. No. 32 ¶ 107.

Under Georgia law, an employee may agree to
refrain, for a stated period of time following

9

> termination, from soliciting, or attempting to solicit,
> directly or by assisting others, any business from any
> of such employer's customers, including actively seeking
> prospective customers, with whom the employee had
> material contact during his or her employment for
> purposes of providing products or services that are
> competitive with those provided by the employer's
> business.

O.C.G.A. § 13-8-53(b). Georgia courts have provided multiple definitions for the term "solicit." Solicitation may mean "'to entreat, importune . . . to endeavor to obtain by asking or pleading . . . to urge.'" Mgmt. Corp. Grp./Se. v. United Sec. Emp. Programs, 389 S.E.2d 525, 528 (Ga. Ct. App. 1989) (quoting Solicit, WEBSTER'S NEW INTL. DICTIONARY (2d ed. 1934)). Georgia courts have also defined solicitation as:

> To appeal for something; to apply to for obtaining
> something; to ask earnestly; to ask for the purpose of
> receiving; to endeavor to obtain by asking or pleading;
> to entreat, implore, or importune; to make petition to;
> to plead for; to try to obtain; and though the word
> implies a serious request, it requires no particular
> degree of importunity, entreaty, imploration, or
> supplication. To awake or incite to action by acts or
> conduct intended to and calculated to incite the act of
> giving. The term implies personal petition and
> importunity addressed to a particular individual to do
> some particular thing.

Akron Pest Control v. Radar Exterminating Co., 455 S.E.2d 601, 602–03 (Ga. Ct. App. 1995) (internal quotation marks omitted) (quoting Solicit, BLACK'S LAW DICTIONARY (6th ed. 1990)). Finally, solicitation has been more concisely defined as "[a]n attempt or effort to gain business." Global Payments Direct v. Frontline Processing Corp., 859 S.E.2d 909, 915 (Ga. Ct. App. 2021) (internal

quotation marks omitted) (quoting *Solicit*, BLACK'S LAW DICTIONARY (7th ed. 2004)). Employment contracts may also restrict indirect solicitation, which "occurs when the former employee undertakes 'some affirmative action on his part that could be considered a solicitation in the broadest possible sense.'" Sysco Food Servs. v. Chupp, 484 S.E.2d 323, 326 (Ga. Ct. App. 1997) (quoting Akron Pest Control, 455 S.E.2d at 603).

**A. Genuine Issues of Material Fact Exist as to Whether Garrison Breached His Non-Solicitation Covenant.**

In his employment contract with USI, Garrison covenanted that he would not directly or indirectly solicit or attempt to solicit services in competition with USI. Dkt. No. 32-2 at 14. Garrison, therefore, would be in breach of his covenant if any affirmative acts on his part could be construed broadly as solicitations. See Sysco Food Servs., 484 S.E.2d at 326. In this regard, a jury could find that Garrison breached his non-solicitation covenant. Several affirmative acts by Garrison lead the Court to this conclusion.

First, Garrison told at least two USI clients that he was leaving the company and transferring to P&C. Dkt. No. 87-1 ¶¶ 134-37. Garrison may have called other clients as well, but this is disputed. Id. ¶ 137. Plaintiff has presented evidence that Jack Cay, the CEO of P&C, left Tillman a voicemail in which he said: "Hey Ashley. It's Jack. It's about a quarter to noon on Wednesday and talked to Frank. He's been telling me he keeps having these

conversations with the clients, and it's going really well, as expected." Id. ¶ 138. A reasonable jury could construe such communications as solicitations.

Georgia courts have found that telling a client of a job transfer to a competitor can constitute indirect solicitation. For example, in Wells Fargo Insurance Services USA v. Gupton, the Northern District of Georgia found evidence of solicitation when a former Wells Fargo employee contacted Wells Fargo clients to inform them that he now worked for a competitor. No. 1:13-CV-520, 2013 U.S. Dist. LEXIS 190019, at *12–13 (N.D. Ga. Mar. 4, 2013). The court explained that "by contacting a former client to let them know that you now work for a competitor, there is an implication that Defendant Gupton can now service their account at the new firm." Id. at 13. In another case, Murphree v. Yancey Bros., a former employee contacted his prior employer's clients to tell them that he was working for a competitor business. 716 S.E.2d 824, 826 (Ga. Ct. App. 2011). Unlike Garrison, however, the former employee in Murphree also submitted bids to these former clients. Id. The court found that initiating contact with former clients constituted solicitation. Id. at 828.

Other Georgia courts have found to the contrary. In LifeBrite Laboratories, LLC v. Cooksey, the Northern District of Georgia found that the defendant did not breach her non-solicitation covenant when she "did no more than to tell the clients that she

was no longer going to be servicing their accounts." No. 1:15-CV-4309, 2016 WL 7840217, at *8 (N.D. Ga. Dec. 9, 2016). The court went on to say: "Surely one does not solicit someone by merely having a conversation. Even mentioning that she was going to work for another lab cannot count as solicitation . . . . Merely informing someone as to a change in circumstances does not qualify." Id. The Northern District of Georgia found it relevant that only one of the clients contacted by the defendant transferred its business to the defendant's new company. Id. This Court does not find the same reasoning persuasive here. A solicitation is a solicitation, regardless of whether a solicitee decides to transfer its business. Solicitation is the "*attempt* or *effort* to gain business," not the consummation of a business relationship. Global Payments Direct, 859 S.E.2d at 915 (emphasis added). A failed attempt to gain business is as much a solicitation as a successful attempt. Id. In determining what constitutes solicitation, it is the effort that counts.

Here, a jury could find that Garrison attempted to gain the business of USI's clients by contacting them and informing them of his new position at P&C. While "merely informing someone as to a change in circumstances" is not a solicitation, the evidence suggests more than "mere conversations" occurred in this case. LifeBrite Labs., LLC 2016 WL 7840217, at *8. Before moving jobs, Garrison contacted USI clients, told them he was leaving the

13

company, told them where he was transferring, and then allegedly told his new employer that his conversations with the USI clients were "going really well, as expected." Dkt. No. 87-1 ¶ 138. A jury, weighing the credibility of witnesses and drawing inferences from the evidence, could conclude that such behavior breached Garrison's non-solicitation covenant.

In addition to his conversations with USI clients, Garrison sent a pizza lunch to Houston Healthcare as it was conducting its RFP process. A jury could also find this to be a breach of the restrictive covenant.

Garrison himself has recognized that sending pizza to Houston Healthcare during the RFP process "is closer to the line of solicitation." Dkt. No. 74-1 at 7. Garrison argues that the pizza lunch "does not cross the line" of solicitation because the pizza delivery did not impact Houston Healthcare's decision to choose P&C as its brokerage and because the pizza delivery "carries none of the hallmarks of solicitation under Georgia law." Id. at 7-9. True, a jury may see the gift of free lunch as having nothing to do with solicitation. Or, they may not. While the pizza lunch was not a formal appeal, petition, or plea for Houston Healthcare's business, a jury could find that the affirmative act of gifting a meal was an effort or attempt to gain Houston Healthcare's business. It is not only the formation of a business relationship that constitutes solicitation, but also the affirmative acts

intended to create a business relationship. <u>See</u> <u>Global Payments</u> <u>Direct</u>, 859 S.E.2d at 915.

As aptly stated by Plaintiff's counsel, "the idea that [solicitation] has to be a formalized aggressive sales pitch doesn't recognize how sales are done . . . . [N]obody likes a pushy salesman." Dkt. No. 110 at 34. However the defense "slices it," sending pizza to a potential client as it is reviewing insurance brokerage proposals could be considered a solicitation. Determining whether Garrison's conduct of sending pizza and contacting USI's clients crossed the line of solicitation is a job that must be done by a factfinder. Garrison's motion for summary judgment is, therefore, **DENIED** as to USI's beach of non-solicitation covenant claim. USI's motion for summary judgment is also **DENIED** as to this claim.

## B. Tillman is Entitled to Summary Judgment on USI's Breach of Non-Solicitation Covenant Claim.

While disputes of material fact exist that could allow a jury to find Garrison breached his non-solicitation covenant, the same cannot be said for Tillman. Instead, the undisputed evidence establishes that Tillman did not breach her non-solicitation covenant.

Tillman's non-solicitation covenant is nearly identical to Garrison's. Dkt. No. 32-1 at 5. Unlike Garrison, however, Tillman did not initiate contact with USI clients. Dkt. No. 89-2 ¶ 90.

Rather, these clients initiated contact with Tillman to discuss moving their business to P&C. Id. Once contacted, Tillman told these clients that she could not solicit their business and provided the contact information for other staff members at P&C. Id. ¶¶ 93, 101, 107-08.

Georgia law distinguishes individuals bound by non-solicitation covenants who initiate contact from those who receive contact. See Univeral Prot. Serv., LLC v. Bohling, No. 1:23-CV-851, 2023 WL 5668009, at *9 (N.D. Ga. May 22, 2023) (collecting cases); see also Vulcan Steel Structures, Inc. v. McCarty, 764 S.E.2d 458, 460 (Ga. Ct. App. 2014) ("The law is clear: solicitation requires some type of affirmative action; therefore, a non[-]solicitation provision may not contain a bar on the acceptance of business from unsolicited clients." (internal quotation marks and citation omitted)). "Merely accepting overtures" from a former employer's customers does not constitute solicitation. Orkin Exterminating Co. v. Walker, 307 S.E.2d 914, 917 (Ga. 1983); see also Akron Pest Control, 455 S.E.2d at 603 ("Merely accepting business that [the former employee] was forbidden otherwise to seek out for a period of time does not in any sense constitute a solicitation of that business." (citation omitted)).

While Garrison made the affirmative act of initiating contact, Tillman did not. When she received unsolicited business

16

overtures from USI clients, Tillman forwarded this information to others at P&C who were not bound by a non-solicitation covenant. Taking these facts together, Tillman's conduct did not breach her non-solicitation covenant under Georgia law. Tillman's motion for summary judgment is, therefore, **GRANTED** as to USI's Breach of Non-Solicitation Covenant Claim. USI's motion for summary judgment is **DENIED** as to this claim.

## II.  Breach of Non-Compete Covenant

USI next alleges: "Garrison has breached the Non-Compete Covenant by, among other things, directly or indirectly providing products and services to Roger Wood Foods and likely other USI Client Accounts on behalf of P&C that compete, and are reasonably anticipated to compete, in the same markets, with products and services of USI." Dkt. No. 32 ¶ 114.

Georgia law permits the "enforcement of contracts that restrict competition during the term of a restrictive covenant, so long as such restrictions are reasonable in time, geographic area, and scope of prohibited activities." O.C.G.A. § 13-8-53(a). A non-compete covenant can be enforced after the term of employment only if the employee meets certain requirements. Id. Relevant here, two of those requirements are that the employee "[c]ustomarily and regularly solicit[ed] for the employer customers or prospective customers" or "[c]ustomarily and regularly engage[d] in making sales or obtaining orders or

17

contracts for products or services to be performed by others." Id. The employee against whom enforcement is sought need only satisfy one of these requirements. Id.

**A. Garrison's Non-Compete Covenant is Valid and Enforceable.**

Garrison first argues that his non-compete covenant is invalid and unenforceable because it lacks a geographic limitation. Dkt. No. 74-1 at 10. He is wrong.

The non-compete covenant in Garrison's employment contract contains an explicit geographic limitation. The covenant provides:

> Producer agrees that, during Producer's employment with the Company . . . and during the Non-Competition Period [of two years following Producer's termination], Producer will refrain from carrying on any business in competition with the Company, directly or indirectly, as a producer or member or manager of a sales team, with respect to any Client Account or Active Prospective Client within a 100-mile radius of the USI office in Savannah, Georgia.

Dkt. No. 32-2 at 14-15. Garrison argues that this covenant "reveals that the 100-mile radius does not delineate a territory in which Garrison cannot compete. Rather, the radius describes a group of clients with whom Garrison cannot work no matter where in the world he might be." Dkt. No. 74-1 at 11.

Garrison's non-compete covenant is clear and unambiguous. See Marvel Enters. v. World Wrestling Fed'n Entm't, Inc., 610 S.E.2d 583, 588 (Ga. Ct. App. 2005) (internal quotation marks omitted) ("First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract

according to its clear terms; the contract alone is looked to for its meaning." (quoting <u>Schwartz v. Harris Waste Mgmt. Grp.</u>, 516 S.E.2d 371, 375 (Ga. Ct. App. 1999))). Garrison's covenant cannot be read to create some worldwide exclusionary zone of competition. Instead, it clearly states that Garrison cannot compete against USI within 100 miles of USI's Savannah office by servicing certain accounts. The covenant may be verbose, but it is not ambiguously so. As a result, Garrison's covenant is valid and enforceable.

**B. Although the Non-Compete Covenant is Enforceable, Garrison is Entitled to Summary Judgment as to this Claim.**

Given Garrison's sales position at USI where he solicited clients for the company, Garrison meets the requirements of O.C.G.A. § 13-8-53(a) that could allow USI to enforce his non-compete covenant after his term of employment. The Court, however, finds that no genuine issue of material fact exists that could allow a jury to conclude that Garrison breached his non-compete covenant.

Garrison started his new job at P&C on August 1, 2022. Dkt. No. 89-2 ¶ 145. At the time Garrison started this job, three USI clients—Roger Wood Foods, Fuji, and Grayco—had already transferred their business to P&C. Roger Wood Foods transferred its business to P&C on July 7, 2022. <u>Id.</u> ¶ 120. Fuji transferred to P&C on July 13, 2022. <u>Id.</u> ¶ 103. Grayco moved its business to P&C on July 21, 2022. <u>Id.</u> ¶ 117. To the extent Garrison worked on any of these

accounts as contemplated by his non-compete covenant—and there is scant evidence of him doing so—the companies were no longer USI clients. Preventing a former employee from working on a former client's account is not a "legitimate business interest." See O.C.G.A. § 13-8-51(9) (defining "legitimate business interest" as including "specific prospective or existing customers"). While the evidence is clear that these former clients were no longer existing USI clients, USI has also not presented evidence that these three companies were "specific prospective" clients. Garrison's motion for summary judgment is, therefore, **GRANTED** as to USI's claim for breach of the non-compete covenant. USI's motion for summary judgment is **DENIED** as to this claim.

### III.   Breach of Employee Non-Interference Covenant

Third, USI alleges that "Tillman and Garrison have breached the Employee Non-Interference Covenants by, among other things, directly or indirectly inducing each other to leave USI for P&C." Dkt. No. 32 ¶ 121.

Employee non-interference covenants—also known as employee no-hire or employee no-solicitation covenants—are also governed by the RCA. Belt Power, LLC v. Reed, 840 S.E.2d 765, 769 (Ga. Ct. App. 2020) (citing O.C.G.A. § 13-8-51). Specifically, employee non-solicitation covenants are "covenants restricting competition" subject to the requirements the RCA. N. Am. Senior Benefits, LLC v. Wimmer, 889 S.E.2d 361, 363-64 (Ga. Ct. App. 2023).

A. **Defendants' Employee Non-Interference Covenants are Valid and Enforceable.**

In her motion for summary judgment, Tillman argues that her employee non-interference covenant is invalid and unenforceable as a matter of law. Dkt. No. 75-1 at 8. Garrison does not argue in his motion for summary judgment that his non-interference covenant is invalid. Dkt. No. 74-1. As Tillman's non-interference covenant is nearly identical to Garrison's, however, the Court will address the validity of both. In short, the covenants are valid and enforceable.

The covenants provide that Defendants "will not, directly or indirectly, solicit the employment, consulting or other services of, or hire, any other employee" of USI with whom they worked. Dkt. Nos. 32-1 at 6, 32-2 at 15. The covenants applied during Defendants' terms of employment and for two years following their termination dates. Id. Tillman argues her covenant is invalid because it lacks a geographic limitation as required by Georgia law. Dkt. No. 75-1 at 8 (citing Wimmer 889 S.E.2d at 366). To Tillman's point, the covenants do not include a geographic limitation. See Dkt. Nos. 32-1 at 6, 32-2 at 15. USI argues that it "is only seeking to enforce the in-term restrictions in the covenants, those applicable during Defendants' employment with USI," which are distinguishable from post-employment restrictions. Dkt. No. 89 at 2. The Court agrees.

21

Georgia's Restrictive Covenants Act distinguishes covenants that apply during a term of employment ("intra-employment") from covenants that apply after a term of employment ("post-employment"). See O.C.G.A. §§ 13-8-56(4), 53(a). Georgia courts have concluded the same. See Wimmer, 889 S.E.2d at 362–63 ("[T]he [RCA] distinguishes 'contracts that restrict competition after the term of employment' from those that operate during the term of employment." (quoting O.C.G.A. § 13-8-53(a))); see also Cap. Inventory, Inc. v. Green, No. 1:20-CV-3224, 2022 WL 4283205, at *6 (N.D. Ga. Mar. 29, 2022) ("Because [the restrictive covenant] contains restrictions that apply both during and after the Individual Defendants' employment with Plaintiff, the Court finds that the enforceability of [the covenant] is governed by O.C.G.A. § 13-8-56(4) and O.C.G.A. § 13-8-53(a). O.C.G.A. § 13-8-56(4) applies to 'any restriction that operates during the term of an employment relationship,' while O.C.G.A. § 13-8-53(a) applies to 'contracts that restrict competition during the term of a restrictive covenant.'" (alterations adopted)).

USI does not seek to enforce Defendants' post-employment restrictions contained in the non-interference covenant. Instead, USI seeks to enforce Defendants' intra-employment restrictions. Dkt. No. 89 at 2–3. "Any restriction that operates *during* the term of an employment relationship . . . shall not be considered unreasonable because it lacks any specific limitation upon . . .

geographic area so long as it promotes or protects the purpose or subject matter of the agreement or relationship or deters any potential conflict of interest." O.C.G.A. § 13-8-56(4) (emphasis added). Although Defendants' non-interference covenants lack geographic limitations, these covenants are valid and enforceable because Plaintiff seeks only the enforcement of the restrictions that applied during the terms of Defendants' employment. <u>Id.</u>

## B. Tillman is Entitled to Summary Judgment on USI's Breach of Employee Non-Interference Covenant Claim.

The undisputed evidence establishes that Tillman did not breach her employee non-interference claim. The evidence establishes that Tillman and Garrison spoke about leaving USI for new positions at P&C. Dkt. No. 87-1 ¶¶ 143-51. These communications, however, do not meet Georgia's definitions of solicitation. There is no evidence that Tillman appealed, asked, or even tried to get Garrison to leave USI for P&C. <u>See</u> <u>Akron Pest Control</u>, 455 S.E.2d at 602-03. Tillman's conduct could not be considered solicitation, direct or indirect, even in the broadest possible sense. This is because the evidence does not show any attempt or effort by Tillman to solicit Garrison. Tillman's motion for summary judgment is, therefore, **GRANTED** as to USI's breach of employee non-interference covenant claim. USI's motion for summary judgment is **DENIED** as to this claim.

**C. USI is Entitled to Summary Judgment on its Breach of Employee Non-Interference Claim Against Garrison.**

Garrison is not entitled to summary judgment on this claim. Rather, the undisputed evidence establishes that USI is entitled to judgment as a matter of law.

It is undisputed that Garrison wanted Tillman to transfer to P&C with him. Dkt. No. 87-1 ¶ 88. During Garrison's recruitment process with P&C, he told P&C that USI clients would be more amenable to transferring their business to P&C if Tillman joined the company. Id. ¶¶ 89–91. Garrison also told P&C's CEO that he "[h]ad some time to feel Ashley out last Thursday [May 5, 2022] and wanted to talk to you about it." Id. ¶ 94. During his conversations with Tillman, Garrison told her the reasons why he was considering leaving USI for P&C. Dkt. No. 99-1 at 163:14–16. Garrison also possibly gave Tillman's contact information to P&C's CEO, but the parties dispute this fact.[1] Dkt. No. 87-1 ¶ 96. After P&C contacted Tillman and invited her to a meeting, Garrison told her that "it may be worth it to hear what they have to say." Id. ¶ 100. Around this time, Garrison also told P&C's CEO: "[Tillman] let me know she got your message. I asked her to keep me posted on the conversation and she said she would." Id. ¶ 101. Once Tillman

---

[1] Even assuming Garrison did not give Tillman's contact information to P&C, there is more than sufficient undisputed evidence that requires summary judgment in favor of USI on liability on the non-interference claim.

met with P&C, Garrison again texted the CEO: "Ashley told me she called and is meeting you next week. Good sales job!! She is tough. feedback from her was I hope they have the same [account executive] support I have now, which means marketing and analytics support." Id. ¶ 103. Garrison also suggested that Tillman send P&C a copy of her USI employment contract, which she did. Id. at 107. After Tillman met again with P&C, Garrison texted her: "John Cay, [the Chairman of P&C] is going to call you. Definitely answer." Id. ¶ 109. Ultimately, when Tillman decided to resign from USI, Garrison gave her advice on submitting her resignation notice. Id. ¶ 149.

Georgia courts have found similar conduct to breach a non-interference covenant. For example, in Capitol Inventory, Inc. v. Green, the Northern District of Georgia concluded that a defendant breached his non-interference covenant as a matter of law when the evidence established that he encouraged a competitor company to contact a fellow employee about hiring, contacted the employee about sending his resume to the competitor, and told the employee of reasons to leave the present company. 2022 WL 4283205, at *10-11. In another case, the court concluded that a defendant breached his employee non-interference covenant because he was "personally involved" in hiring an employee from his former employer. Heartland Payment Sys., Inc. v. Stockwell, 446 F. Supp. 3d 1275, 1285 (N.D. Ga. 2020).

Drawing all inferences in Garrison's favor, the undisputed evidence establishes that he breached his employee non-interference covenant. Garrison's affirmative actions can easily be considered solicitation in the broadest possible sense. See Sysco Food Servs., 484 S.E.2d at 326. Garrison made a concerted effort and attempt to have Tillman leave USI for P&C. He told P&C the benefits of hiring Tillman, he told Tillman why he was considering P&C, he repeatedly told Tillman to speak with executives at P&C, and he gave P&C information from his conversations with Tillman that could be used to hire her. Further, Garrison told Tillman to send P&C her USI contract and advised her on resigning from USI. Solicitation "implies [a] personal petition and importunity addressed to a particular individual to do some particular thing." Akron Pest Control, 455 S.E.2d at 602-03. Garrison's conduct shows a persistent effort addressed toward Tillman for her to transfer to P&C. Through his behind-the-scenes cooperation with P&C leadership and suggestions that Tillman speak to certain people or send certain documents, Garrison was personally involved in P&C's hiring of Tillman. Disregarding all contested facts or evidence, the undisputed evidence is sufficient for the Court to find that Garrison breached his employee non-interference covenant. Garrison's motion for summary judgment is, therefore, **DENIED** as to USI's breach of employee non-interference

covenant claim. USI's motion for summary judgment is **GRANTED** as to this claim.

## IV.   Breach of Confidentiality and Non-Disclosure Covenant

Fourth, USI claims that Defendants breached their confidentiality and non-disclosure covenants by "disclosing Confidential Information of USI to P&C during and after their employment with USI, sending Confidential Information of USI to themselves in a manner inconsistent with their duties of loyalty to USI, and using Confidential Information of USI on behalf of and during the course of their employment with P&C." Dkt. No. 32 ¶ 129. Defendants both covenanted to not use or disclose USI's confidential information during their employment and for five years after termination. Dkt. Nos. 32-1 at 4–5, 32-2 at 13–14. Defendants' contracts with USI included the same definition of "confidential information." Confidential information is defined as follows:

> i) the identity, authority and responsibilities of key contacts and decision-makers employed by Client Accounts or Active Prospective Clients of the Company or any Predecessor; ii) the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of Client Accounts or Active Prospective Clients of the Company or any Predecessor; iii) the terms and conditions of the benefits and compensation plans of Client Accounts or Active Prospective Clients of the Company or any Predecessor; iv) information furnished to the Company or any of Predecessor in confidence by Client Accounts or Active Prospective Clients; v) the business plans,

27

marketing strategies, and pricing structure, criteria
and formulae for insurance and benefits products and
claims management, and unpublished financial data and
statements of the Company, its corporate affiliates, or
any Predecessor; vi) lists of Client Accounts or Active
Prospective Clients of the Company and any Predecessor,
and any analyses and compilations thereof; vii)
information that is password-protected; viii) any and
all other proprietary information of the Company, any
Predecessor, or a USI Company, including any information
contained within a proprietary database; and ix) any and
all other information that constitutes a trade secret
under the governing trade secrets law.

Dkt. Nos. 32-1 at 10-11, 32-2 at 6-7.

## A. Genuine Issues of Material Fact Exist as to Whether Tillman Breached Her Confidentiality and Non-Disclosure Covenant.

USI alleges that Tillman breached her confidentiality covenant before and after leaving the company. Dkt. No. 89 at 14-15. The Court finds disputes of material fact as to whether Tillman breached her covenant.

Before resigning her position at USI, Tillman sent an email from her USI email to her personal email that attached a contact list for various carriers and other service providers. Dkt. No. 87-1 ¶ 129. She obtained this information while working at USI and used the information as part of her job at USI. Id. Tillman said that she sent this information so she "wouldn't have to look up every carrier that [she] ever worked with again." Id. Tillman also made handwritten notes of the events and client meeting dates marked on her USI calendar. Id. ¶ 130.

USI next alleges that after Tillman transferred to P&C, she

28

used USI's confidential fee information to create P&C's proposals for Houston Healthcare and Fuji. Dkt. No. 89 at 15. USI argues that the evidence shows Tillman input confidential fee information in USI's proposals. Dkt. No. 87-1 ¶ 263. Tillman argues that "[t]he testimony is disputed as to whether Tillman 'picked' the fee" or was simply aware of the fees paid by clients in the past. Id.

USI also alleges that Tillman copied confidential information from client presentations used by USI. Dkt. No. 89 at 15-16. Here, the evidence shows that sections of two presentations given by P&C for Fuji are identical to a presentation USI prepared for Fuji before Tillman resigned. Dkt. No. 87-1 ¶ 188. The USI presentation stated on the cover page: "CONFIDENTIAL AND PROPRIETARY. This presentation and the information contained herein is confidential and proprietary information of USI Insurance Services LLC ('USI'). Recipient agrees not to copy, reproduce or distribute this document, in whole or in part, without the prior written consent of USI." Id. ¶ 189. Tillman also requested that Grayco send her a presentation previously prepared by USI. Id. ¶ 205. Grayco sent this presentation, which also stated on the cover page: "CONFIDENTIAL AND PROPRIETARY. This presentation and the information contained herein is confidential and proprietary information of USI Insurance Services LLC ('USI'). Recipient agrees not to copy, reproduce or distribute this document, in

whole or in part, without the prior written consent of USI." Id.
On a third occasion, Tillman used the login credentials of a
Houston Healthcare employee to access a USI presentation uploaded
to Brainshark, a software program used by USI and its clients.
Id. ¶¶ 267-68. Tillman later told the same employee: "I was able
to get in. I will have to try to work on this tomorrow to pull
the info before they [USI] shut it down." Id. ¶ 267. Tillman then
used the USI presentation to create a P&C presentation. Id. ¶ 270.
Tillman argues that she did this because Houston Healthcare asked
her to urgently create an employee benefits enrollment
presentation from P&C that was the same as the USI presentation.
Id.

Whether Tillman breached her confidentiality covenant is a
matter that must be resolved by a jury. The evidence presents
genuine factual disputes over whether USI's information obtained
by Tillman is actually confidential information as defined in
Tillman's contract. Further, a jury must determine whether Tillman
input confidential fee information into P&C's proposals. Making
these determinations will require credibility assessments,
drawing inferences, and factfinding. This must be done by a jury.
Therefore, Tillman's motion for summary judgment is **DENIED** as to
USI's breach of confidentiality and non-disclosure covenant claim.
USI's motion for summary judgment is also **DENIED** as to this claim.

**B. Genuine Issues of Material Fact Exist as to Whether Garrison Breached His Confidentiality and Non-Disclosure Covenant.**

USI alleges that Garrison disclosed confidential information to P&C by disclosing "the identities of the clients he was servicing at USI and the revenue USI received from each client." Dkt. No. 89 at 17. While most of this information was publicly available and not confidential, there is a dispute of material fact regarding some of the disclosed information.

Beginning with the identities of USI's clients, the parties agree that companies employing more than one hundred employees must publicly file a document known as a Form 5500. Dkt. No. 89-2 ¶ 22. The form lists a given company's insurance broker and the annual revenue paid to the brokerage. Id. ¶¶ 25–34. Insurance brokerages like USI and P&C use these public forms to identify possible clients. Id. ¶ 26. When Garrison met with P&C, all but one of his clients were publicly listed with USI as their brokerage. Id. ¶¶ 25–34. The only client that was not publicly listed was Roger Wood Foods. Id. ¶ 56. Roger Wood Foods does file some publicly available information, but these public filings do not name USI as its insurance brokerage. Dkt. No. 76-6 at 113–17. While the parties agree that P&C's CEO is familiar with Roger Wood Foods and is friends with its owner, there is no evidence that the P&C CEO knew Roger Wood Foods was a USI client until Garrison told him.

31

Turning next to revenue disclosures, all of Garrison's USI clients but Roger Wood Foods publicly disclosed the amount of money paid to USI. Dkt. No. 89-2 ¶ 28. USI argues that these public revenue amounts are wildly inaccurate and far less than the actual amounts paid to USI by the clients. Dkt. No. 89 at 18. USI, thus, contends that Garrison provided the actual revenue amount rather than the publicly listed revenue amount. Id. at 18–19. There is no evidence of this. For every client but Roger Wood Foods, the evidence does not show that Garrison gave P&C any revenue information that was not already publicly known. USI may dispute that Garrison provided P&C with the publicly known revenue amounts, but it has not provided evidence that he did anything to the contrary. As to Roger Wood Foods, however, the evidence shows that the revenue amount was not publicly filed. Whether P&C already knew this amount or Garrison gave confidential information is a matter that must be decided at trial. Accordingly, Garrison's motion for summary judgment is **DENIED**, but only to USI's claim that he disclosed confidential information regarding Roger Wood Foods. Garrison's motion for summary judgment is **GRANTED** as to all other breach of confidentiality claims. USI's motion for summary judgment on this claim is **DENIED**.

## V.   Breach of Fiduciary Duty and Duty of Loyalty

Last, USI alleges that "Tillman and Garrison breached their fiduciary duty to USI by, among other things, disclosing to P&C

Confidential Information of USI while employed by USI and working to move the business of USI Client Accounts to P&C while employed by USI." Dkt. No. 32 ¶ 144.

**A. Genuine Issues of Material Fact Exist as to Whether Defendants Owed USI Fiduciary Duties**

Defendants argue that they did not owe USI a fiduciary duty and, therefore, cannot have breached any supposed fiduciary duties or duties of loyalty.

"[A] claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." Avion Sys., Inc. v. Bellomo, 789 S.E.2d 374, 376 (Ga. Ct. App. 2016) (internal quotation marks omitted) (quoting Nash v. Studdard, 670 S.E.2d 508, 514 (Ga. Ct. App. 2008)). Likewise, "a cause of action against an employee for breach of loyalty must be based upon a fiduciary duty owed by the employee and must rise and fall with any claim for breach of fiduciary duty." Physician Specialists in Anesthesia, P.C. v. Wildmon, 521 S.E.2d 358, 362 (Ga. Ct. App. 1999).

A fiduciary relationship arises "where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal

and agent, etc. . . . . Such relationship may be created by law, contract, or the facts of a particular case." Wright v. Apt. Inv. & Mgmt. Co., 726 S.E.2d 779, 785-86 (citing O.C.G.A. § 23-3-58). A fiduciary duty exists when there is an agency relationship between the parties. Smith v. Pennington, 15 S.E.2d 727, 728 (Ga. 1941). An agency relationship arises "wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." O.C.G.A. § 10-6-1. "Although an employee may at times act on behalf of his employer, an employer-employee relationship does not typically create a principal-agent relationship." Wildmon, 521 S.E.2d at 360 (citations omitted). An agent can create obligations on behalf of a principal and is "vested with authority, real or ostensible, to create obligations on behalf of his principal, bringing third parties into contractual relations with him." Id. (internal quotation marks and citations omitted).

USI argues that Defendants contractually assumed fiduciary duties when they assumed duties of loyalty in their employment contracts. Dkt. No. 78-1 at 22. Resolution of this issue thus turns on whether the loyalty provisions in Defendants' contracts created fiduciary duties or whether the facts show that, in practice, Defendants had some fiduciary relationship with USI. Critically, "the existence of [a fiduciary] relationship is generally a factual matter for the jury to resolve." Douglas v. Bigley, 628 S.E.2d

199, 205 (Ga. Ct. App. 2006); <u>see also</u> <u>Rigby v. Flue-Cured Tobacco</u> <u>Coop. Stabilization Corp.</u>, 755 S.E.2d 915, 925 (Ga. Ct. App. 2014) ("Generally, the existence or nonexistence of a fiduciary duty is a question of fact for the jury." (internal quotation marks and citation omitted)). The Court finds no reason to depart from this settled rule of Georgia law. Whether Defendants owed USI a fiduciary duty is a factual matter that must be left to a jury. Consequently, Defendants' and USI's motions for summary judgment are **DENIED** as to USI's breach of fiduciary duty and duty of loyalty claims.

## CONCLUSION

For these reasons, Defendant Garrison's motion for summary judgment, dkt. no. 74-1, is **GRANTED in part** and **DENIED in part.**

The motion is **GRANTED** as to:

- Plaintiff's breach of non-compete covenant (Count III);

- Plaintiff's breach of confidentiality and non-disclosure covenants (Count V) regarding all USI clients but Roger Wood Foods.

These claims are therefore **DISMISSED with prejudice.**

The motion is **DENIED** as to:

- Plaintiff's breach of non-solicitation covenant claim (Count II);

- Plaintiff's breach of employee non-interference covenant (Count IV);

- Plaintiff's breach of confidentiality and non-disclosure covenants (Count V) for information regarding Roger Wood Foods;

- Plaintiff's breach of the duty of loyalty claim (Count VI);

- Plaintiff's breach of fiduciary duty claim (Count VII).

Defendant Tillman's motion for summary judgment, dkt. no. 75-1, is **GRANTED in part** and **DENIED in part**. The motion is **GRANTED** as to:

- Plaintiff's breach of non-solicitation covenant claim (Count II);

- Plaintiff's employee non-interference claim (Count IV).

These claims are therefore **DISMISSED with prejudice.**

The motion is **DENIED** as to:

- Plaintiff's breach of confidentiality and non-disclosure covenants (Count V);

- Plaintiff's breach of the duty of loyalty claim (Count VI);

- Plaintiff's breach of fiduciary duty claim (Count VII).

Plaintiff USI's motion for summary judgment, dkt. no. 78, is **GRANTED in part** and **DENIED in part**. The motion is **GRANTED** as to:

- Plaintiff's employee non-interference claim against Garrison (Count IV).

The motion is **DENIED** as to all other claims against Defendants.

The Parties are **ORDERED** to file a proposed consolidated pretrial order on or before June 7, 2024.  A pretrial conference will be held on June 17, 2024 at 2 p.m. and a jury trial will be held on July 30, 2024 at 9 a.m. in Savannah, Georgia.

**SO ORDERED** this 26th day of April, 2024.

_____

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA